## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### Springfield Division

| | |
|---|---|
| _____ ) | |
| FEDERAL ENERGY ) | |
| REGULATORY COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. Action No. 3:25-cv-3116 |
| ) | |
| KETCHUP CADDY, LLC AND ) | |
| PHILIP MANGO ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

### COMPLAINT

Plaintiff Federal Energy Regulatory Commission ("Commission" or "FERC") respectfully applies to the Court for a judgment pursuant to 16 U.S.C. § 823b(d)(5) enforcing compliance by the Defendants, Philip Mango ("Mango") and his company, Ketchup Caddy, LLC ("Ketchup Caddy"), with a final Commission order entered against them on December 5, 2024 and pursuant to 16 U.S.C. §§ 824v, 825o-1, directing (1) Ketchup Caddy to pay a civil penalty of $25,000,000 plus interest; (2) Mango to pay a civil penalty of $1,500,000 plus interest; and (3) Mango to disgorge $506,502 plus interest.

In support, the Commission states as follows:

**INTRODUCTION**

1.      Between March 2019 and October 2021 (the "Relevant Period"),

Mango and Ketchup Caddy perpetrated a brazen fraud on the wholesale electricity

market operated by the Midcontinent Independent System Operator ("MISO")—a

market spanning almost all of Illinois, reaching fourteen other states, and indirectly

serving 45 million energy consumers.  MISO administers a capacity market termed

the Planning Resource Auction ("PRA") to compensate (i) electricity generators

and (ii) companies that have committed to reduce their consumption of electricity

for providing grid reliability.[1]

2.      Although the electric markets and products impacted by Mango's and

Ketchup Caddy's fraud are complex, the core underlying fact pattern is simple:

Mango and Ketchup Caddy illicitly took non-public customer information from the

website of Ameren Illinois ("Ameren"), a public utility.  Using that information,

Mango and Ketchup Caddy falsely represented to MISO that Ketchup Caddy had

convinced customers to reduce their electricity usage when called on by MISO to

---

[1] A capacity market is a wholesale electricity market that ensures there is
enough reliable electricity available to meet demand.  A grid operator, such as
MISO, does this by securing firm commitments from power suppliers and demand-
side resources to be available when needed.  *See, e.g., Advanced Energy Mgmt. All.
v. FERC,* 860 F.3d 656, 659 (D.C. Cir. 2017) (capacity is the "commitment to
produce electricity or forgo the consumption of electricity when required.").

do so; and, based on this false representation, Ketchup Caddy was paid by MISO

for registering and clearing fraudulent demand response resources with MISO.[2]

3.    Over the course of the fraud, Ketchup Caddy was paid $1,013,004 for

capacity by MISO—an amount that was split evenly between Mango and Todd

Meinershagen, a business partner who was kept in the dark as to the money's

fraudulent origin.[3]  The conduct caused $17,639,142.07 in actual losses incurred by

other market participants due to the resulting market distortion caused by

artificially low prices that Ketchup Caddy and Mango used to obtain payments for

their false capacity.

---

[2] Demand response is a "change[] in electric usage by end-use customers
from their normal consumption patterns in response to changes in the price of
electricity over time, or to incentive payments designed to induce lower electricity
use at times of high wholesale market prices or when system reliability is
jeopardized."  *U.S. Department of Energy, Benefits of Demand Response in
Electricity Markets and Recommendations for Achieving Them: A Report to the
United States Congress Pursuant to Section 1252 of the Energy Policy Act of 2005*,
(February 2006) *available at*
https://www.energy.gov/sites/prod/files/oeprod/DocumentsandMedia/DOE_Benefi
ts_of_Demand_Response_in_Electricity_Markets_and_Recommendations_for_Ac
hieving_Them_Report_to_Congress.pdf; *see also* 18 C.F.R 35.28(b)(4) (2024)
(defining demand response as "a reduction in the consumption of electric energy
by customers from their expected consumption in response to an increase in the
price of electric energy or to incentive payments designed to induce lower
consumption of electric energy.").

[3] *Todd Meinershagen*, 181 FERC ¶ 61,251, at P 12 (2022) (Order Approving
Stipulation and Consent Agreement) (agreeing to pay $525,451.93 in
disgorgement).  "P" indicates the internal paragraph number in a FERC order.

4.     After an investigation into the conduct by the Commission's Office of Enforcement ("Enforcement"), the Commission initiated an administrative order to show cause proceeding.[4]  Following notice and service, Ketchup Caddy and Mango failed to answer.  Accordingly, the Commission, by order, assessed a civil penalty of $25,000,000 on Ketchup Caddy, assessed a civil penalty of $1,500,000 on Mango, and directed Mango to disgorge $506,502, plus interest, in unjust profits.[5]  The Commission is filing this action seeking a judgment to enforce the Commission's Order Assessing Penalties imposing those remedies.

## THE PARTIES

5.     FERC is an administrative agency of the United States, organized and existing as an independent, bipartisan Commission, pursuant to, *inter alia*, the Federal Power Act ("FPA"), 16 U.S.C. §§ 791a *et seq*.  Under the FPA, the Commission is charged with, among other things, ensuring just and reasonable prices of wholesale electricity and regulating those markets.

6.     Mango is a resident of Frisco, Texas.

---

[4] *Ketchup Caddy, LLC & Philip Mango*, 186 FERC ¶ 61,132 (2024) (Order to Show Cause), attached as **Exhibit 1**.

[5] *Ketchup Caddy, LLC & Philip Mango*, 189 FERC ¶ 61,176, at P 1 (2024) (Order Assessing Penalties), attached as **Exhibit 2**.  The Order Assessing Penalties is incorporated into this Complaint by reference and explains the Commission's findings and determinations.

7.      Ketchup Caddy is a Texas corporation.  Ketchup Caddy's principal place of business is Frisco, Texas.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to FPA Section 31(d)(5), 16 U.S.C. § 823b(d)(5); FPA Section 317, 16 U.S.C. § 825p; and 28 U.S.C. § 1331.

9.      This Court has personal jurisdiction over each of the Defendants pursuant to Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure because FPA Section 317, 16 U.S.C. § 825p, provides for nationwide service of process and therefore satisfies this subdivision of Rule 4, which states that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute."  Defendants are subject to personal jurisdiction based on their contacts with the United States, including Ketchup Caddy's incorporation in Texas and maintenance there of its principal place of business; Mango's residence in Texas; Ketchup Caddy's business transactions with MISO, which is headquartered in Indiana and administers the electric grid in the central United States, including almost all of Illinois; and Ketchup Caddy's utilization of Ameren's website and customer data.  Ameren is headquartered, and its utility customers are located, in Illinois.

10.     Venue properly lies within the Central District of Illinois pursuant to
FPA Section 317, 16 U.S.C. § 825p, because acts and transactions constituting the
violations occurred in this District.  The basis for filing in the Springfield Division
is because Ameren customers—whose ability to reduce electricity usage was
fraudulently entered in MISO's capacity auctions by Mango and Ketchup Caddy,
as well as other generators who participate in the MISO capacity market and were
affected by that fraud—are located here.

11.     Defendants engaged in an unlawful scheme to defraud MISO's
capacity market and to violate the MISO Open Access Transmission, Energy and
Operating Reserve Markets Tariff (the "MISO Tariff")—a Commission-approved
set of rates and terms by which market participants are bound to operate.[6]  MISO's
coverage area (which is depicted on the map below in blue, green, and orange),
includes this District and specifically the Springfield Division.



---

[6] MISO's Tariff is available here, https://www.misoenergy.org/legal/rules-manuals-and-agreements/tariff/.

12.     To effectuate the scheme, Defendants registered Ameren customers, including customers located in this District and within the Springfield Division, fraudulently sold those customers' demand reduction capacity at three annual capacity auctions, and never remitted any portion of the customers' capacity payments to them.

13.     In addition, power generators located in this District and within the Springfield Division, who entered their capacity into MISO's auctions, and whose capacity cleared/sold, were paid less than they otherwise would have been but for Defendants' conduct.

14.     MISO is divided into zones.  MISO Zone 4 encompasses most of Illinois.  Overall, Defendants' unlawful scheme caused harm to MISO and to its market participants in MISO Zone 4, including but not limited to, those within the Central District of Illinois and within the Springfield Division.

## BACKGROUND

### A. The Commission's Anti-Manipulation Authority

15.     The Commission's core statutory mission under the FPA is to ensure that wholesale prices for the transmission and sale of electric energy in interstate commerce are just and reasonable.  *See* FPA Sections 201, 205; 16 U.S.C. §§ 824, 824d.  In the wake of the Western Energy Crisis of 2000-2001 and the resulting unjust and unreasonable rates caused by Enron Corporation's manipulative

schemes, Congress, through the Energy Policy Act of 2005, Pub. L. 109-58

("EPAct 2005"), amended the FPA to give the Commission two new enforcement

tools.  *First*, EPAct 2005 gave the Commission the authority to assess civil

penalties of up to $1 million per day, per violation, against any person who violates

Part II of the FPA (concerning wholesale electric markets) or any rule or order

thereunder.  FPA Section 316A(b), 16 U.S.C. § 825o-1(b); *see* FPA Section 3(4),

16 U.S.C. § 796(4) (defining "person" to include an individual or corporation).

*Second*, EPAct 2005 provided additional authority to prohibit market manipulation

in Part II of the FPA.  In relevant part, FPA Section 222, 16 U.S.C. § 824v(a),

makes it:

> [U]nlawful for any entity . . . directly or indirectly, to use or employ,
> in connection with the purchase or sale of electric energy . . . subject
> to the jurisdiction of the Commission any manipulative or deceptive
> device or contrivance (as those terms are used in section [10(b) of the
> Securities Exchange Act of 1934, 15 U.S.C §78j(b)]), in contravention
> of such rules and regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for the protection of
> electric ratepayers.

16.    After EPAct 2005 became law, the Commission promulgated its Anti-

Manipulation Rule, 18 C.F.R. § 1c.2, which prohibits an entity from:  "(1) us[ing]

a fraudulent device, scheme, or artifice, or making a material misrepresentation or

a material omission as to which there is a duty to speak under a Commission-filed

tariff, Commission order, rule, or regulation, or engaging in any act, practice, or

course of business that operates or would operate as a fraud or deceit upon any

entity; (2) with the requisite scienter; (3) in connection with the purchase or sale of [] electric energy subject to the jurisdiction of the Commission." *Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047, at P 49 (2006) ("Order No. 670"); *see also* 18 C.F.R § 1c.2 (2024).

17.    The Commission determined in Order No. 670 that the term "any entity" includes natural persons such as Mango.  Order No. 670 at. P 18.  Every court that has considered the issue has agreed with the Commission.  *See FERC v. Coaltrain Energy, L.P.*, 2018 WL 7892222, at *9-10 (S.D. Ohio 2018); *see also FERC v. City Power Marketing, LLC*, 199 F. Supp. 3d 218, 239-41 (D.D.C. 2016); *FERC v. Maxim Power Corp.*, 196 F. Supp. 3d 181, 200-02 (D. Mass. 2016); *FERC v. Silkman*, 177 F. Supp. 3d 683, 709-11 (D. Mass. 2016); *FERC v. Barclays Bank PLC*, 105 F. Supp. 3d 1121, 1145-46 (E.D. Cal. 2015).

## B.  MISO's Demand Response Programs

18.    MISO is an independent system operator that is subject to FERC's regulation under the FPA.  The Commission has jurisdiction over the terms and conditions of, and rates for, wholesale electric service, pursuant to which it approves tariffs of general applicability filed by MISO and other independent system operators.  MISO's Tariff governs it.  As a grid operator for the central United States, MISO is responsible for maintaining the reliable and affordable operation of the electric grid within its footprint.  MISO's footprint, comprised of

ten zones depicted in the colored areas below, spans 15 states, including most of

Illinois (MISO Zone 4 depicted in orange below).



19.     Like most of the other six U.S. electric grid operators, MISO offers

large energy consumers in its footprint the option of participating in demand

response programs.  The details of demand response programs vary by region but,

at their most basic level, "operators of wholesale markets pay electricity consumers

for commitments *not* to use power at certain times."  *FERC v Elec. Power Supply*

*Ass'n*, 577 U.S. 260, 264 (2016) (emphasis in original).[7]  Demand response

---

[7] In addition to capacity markets, demand response participants and power
generators can participate in wholesale energy markets.  While a capacity market
ensures sufficient generation capacity/reduction in usage is available to meet
demand when needed, an energy market focuses on selling the electricity generated
or demand reductions made—*i.e.,* capacity markets pay generators and demand
response resources for their *ability* to provide power or reduce usage, while energy
markets pay for the *actual amount* of power delivered or demand reductions
achieved.  Here, Mango's and Ketchup Caddy's conduct pertains only to MISO's

participants in capacity markets receive a recurring payment (termed a capacity payment) from MISO to maintain their availability and readiness to reduce electricity use if needed, such as during extreme weather events.  MISO's demand response programs are governed by MISO's Tariff and, where applicable, elaborated upon in MISO's Business Practices Manuals.

20.    One way to participate in MISO's demand response program is as a Load Modifying Resource ("LMR").  LMRs are governed by MISO's Tariff, Module E-1, Section 69A.3.5.[8]  This provision articulates eligibility, performance, and reporting requirements for LMRs.  Significantly, this provision makes clear that only the owners of a resource—*i.e.,* the resource itself—or another who has contracted for equivalent rights can register the resource.  **Exhibit 3**, MISO Tariff, Module E-1 at Section 69A.3.5 ("A Market Participant that possesses ownership or equivalent contractual rights in a Demand Resource can request accreditation for a Demand Resource as an LMR[.]").

21.    To register as an LMR with MISO, market participants must meet certain requirements specified in the MISO Tariff, including providing detailed

---

capacity market.

[8] The sections of Module E-1 cited in this Complaint have been compiled and attached as **Exhibit 3.**  Module E-1's sections were superseded numerous times during the Relevant Period, but the cited language remained unchanged.  For ease of reference, **Exhibit 3** contains only the version of each section that was in effect at the start of the Relevant Period.

information about each LMR resource and its capabilities.  Once registered, and if the resource is accepted, *i.e.*, clears a capacity auction, MISO makes weekly payments to the market participant.

22.    An aggregator of retail customers is a company that helps retail customers, like industrial manufacturers and large stores, participate in MISO's wholesale capacity markets.  Aggregators solicit customers, contract with those customers, represent those customers in the market by interfacing with MISO on their behalf, and ultimately send a portion of the capacity payments received from MISO to the customer, keeping an agreed upon portion of the payment.

### C. **MISO's Planning Resource Auctions**

23.    MISO awards capacity payments based on the results of an annual competitive auction, known as a PRA.  During the Relevant Period, PRAs took place annually in April to ensure that the zones within MISO have enough capacity to meet demand for the upcoming resource year (June through May) based on MISO's modeling forecasts.

24.    Market participants offer capacity from LMRs into the PRA by converting the LMR to Zonal Resource Credits ("ZRCs") in proportion to the resource's capacity to reduce electricity demand when called upon by MISO to do so.  A ZRC is denominated in megawatts (MW) per day (a unit of energy representing the amount of energy produced by a resource over one day at a

constant power level).  The market participant then has the option to offer its ZRCs in the PRA (or sell them bilaterally) provided it owns or possesses contractual rights in the underlying resources.  **Exhibit 3**, MISO's Tariff Module E-1 at Section 69A.4.5.

25.    When bidding into the auction, market participants offer based on price and quantity such as $x$ MW of capacity for $y$ dollars per MW-day.  MISO then aggregates these bids and, after considering a range of factors and needs, selects which bids "clear" the auction and are thus eligible for compensation. MISO's goal with the PRA is to select the least cost set of offers that satisfies its needs, and it is only the bids in this least cost set that clear the PRA and are eligible for compensation.  As a result, lower price bids have a better chance of clearing the auction and qualifying for payment.  Significantly, however, all bids that clear— regardless of the price at which they were bid—are compensated based on the highest price bid that is accepted (which is called the clearing price).

26.    ZRCs are bid and cleared for the specific zone within MISO where the underlying resource operates.  Here, Defendants fraudulently offered LMRs in MISO Zone 4—which covers most of the State of Illinois.

D. **Defendants' Fraudulent Scheme**

### a. *Ketchup Caddy's Illegitimate LMR Business*

27.    Mango, through Ketchup Caddy, pretended to be an LMR aggregator—he misrepresented to MISO his (nonexistent) relationship with customers, the customers' ability to provide capacity, and unlawfully kept their payments.

28.    Mango had been involved in the energy industry since 2006 and so he had many contacts throughout the industry.  From 2011 to 2015, he had worked at a company specializing in the aggregation and registration of demand response resources.

29.    In January 2018, Mango had lunch with two employees of a demand response aggregator company.  During that lunch, Mango learned that that company had set up a program to automatically and secretly scrape non-public information about Ameren's customers from Ameren's website—which it then used to register those customers as LMRs in MISO's systems.

30.    From that lunch, Mango was inspired to launch his own fraudulent demand response operation.  Mango decided to enlist his tech-savvy friend Todd Meinershagen, a computer programmer who lacked any prior experience in the energy field, to develop a similar automatic scraping tool to collect proprietary customer information from Ameren's website.

31.     From approximately May 2018 to March 2019, Meinershagen developed his scraping tool and illicitly downloaded data from Ameren's website. The tool bombarded the website with millions of random account numbers until it located a valid customer account, and then downloaded the account data to a spreadsheet.  **Exhibit 1**, Order to Show Cause at Appendix A, 6-7.  This process required Meinershagen initially to confirm that he "ha[d] received permission from the account holder to view this data."  *Id.* at 7.  Though Meinershagen admitted that he had not personally obtained the requisite permission, he testified that he asked Mango about whether they had permission to view this data, and Mango said: "That's fine.  You know, all the other competitors do the same thing."  *Id.*

32.     While Meinershagen was developing the scraping tool and culling data, Mango was supposed to be contacting customers, obtaining their consent to participate, and filing the necessary paperwork with MISO.  Mango testified, however, that he never drafted any customer contracts and never contacted *any* potential demand response customers to actually contract with them.  *Id.* at 7-8.

33.     On January 14, 2019, Meinershagen became a 50% co-owner of Ketchup Caddy with Mango.

### b. *Ketchup Caddy's Participation in MISO's Capacity Market*

34.     By February 2019, MISO had authorized Ketchup Caddy to be a demand response aggregator and soon thereafter Mango began registering

fraudulent LMRs in MISO's PRAs through Ketchup Caddy.  To register its

purported customers to participate, Ketchup Caddy provided certain data about

them to MISO, some of which Ketchup Caddy, through Mango, fabricated based

on the information Meinershagen's scraping tool had illicitly collected from

Ameren's website.

35.    Every resource that Ketchup Caddy entered in the auctions cleared

because Mango bid them in at $0/MW-day.  He did this for three annual PRAs.  In

its first year, during MISO's 2019/2020 capacity market auction,[9] Ketchup Caddy

cleared 211.1 MW of its submitted fraudulent resources.  The following year, in

the 2020/2021 auction, Ketchup Caddy cleared 303.2 MW of fraudulent customer

capacity.  And in its third year, during the 2021/2022 auction, Ketchup Caddy

cleared 372.3 MW of fraudulent capacity.  With each auction, Ketchup Caddy

received weekly capacity payments for the volume it cleared until October 2021,

when MISO removed the company from its capacity market in response to MISO

becoming aware of Ketchup Caddy's fraudulent registrations.

36.    MISO's capacity payments to Ketchup Caddy for all three auction

years, before it was disqualified by MISO, totaled $1,013,004.  As the weekly

capacity payments came in, Ketchup Caddy regularly distributed funds received

---

[9]  MISO's auction is held in April every year for each upcoming
performance year, which is June 1 through May 31.

from MISO to Mango's and Meinershagen's personal bank accounts.  Mango and

Meinershagen each personally received over $500,000 from Ketchup Caddy.

### c. *Mango Acknowledged the Illegal and Deceptive Nature of the Scheme*

37.    In his sworn investigative testimony, Mango acknowledged that he

had engaged in an illegal and deceptive scheme.  He stated: "Upon further

reflection, I realize the egregiousness and the error of my ways[.]"  **Exhibit 1**,

Order to Show Cause at Appendix A, 11.

38.    Mango also acknowledged that Ketchup Caddy's activities did not

benefit the MISO market and stated that "a reasonable person with time to reflect

at a minimum would come to the conclusions" that its activities were illegal.  *Id.*

39.    Lastly, Mango acknowledged the deceptive nature of his conduct,

admitting that he even kept his partner, Meinershagen, "in the dark" and created a

"mirage" to make Meinershagen believe that their company was formally engaging

with its purported customers because if Meinershagen had known Mango was not

actually contacting customers, Mango thought "[Meinershagen] would have been

vehemently against and uncomfortable with us proceeding in that manner."  *Id.* at

11-12.

### d. Defendants' Scheme Caused More than $17 Million in Actual Losses and Impacted Illinois Market Participants

40.     Mango and Ketchup Caddy's scheme significantly harmed MISO's capacity market: by bidding in hundreds of fraudulent MW each year at zero-dollars-per-megawatt-day, Mango and Ketchup Caddy artificially depressed the prices at which MISO's capacity auction cleared for *all capacity resources*. Enforcement determined that other capacity suppliers, including traditional generators, would have received $17,639,142.07 in additional revenues if Mango and Ketchup Caddy had not bid their zero-priced fraudulent MW into the auctions.[10] The conduct also potentially risked the reliability of MISO's electric grid as MISO could not rely on Ketchup Caddy's fraudulent capacity to curtail demand on the grid in the event of an actual emergency.

41.     All of Defendants' fraudulent registrations were made in MISO Zone 4.[11] Accordingly, the price distortion that occurred from Defendants' conduct specifically and negatively impacted the buyers and sellers of capacity in Illinois.

---

[10] To quantify the actual losses resulting from the market distortion, Enforcement requested that Potomac Economics, MISO's Independent Market Monitor, rerun each PRA from 2019/2020 through 2021/2022 with the MWs Ketchup Caddy offered removed. *Id.* at 12.

[11] Compare map on Ameren Illinois website, https://www.ameren.com/illinois/company/about-ameren/service-territory (last visited May 6, 2025) with MISO Zone 4 map above in paragraph 18.

E. **Enforcement Staff's Investigation**

42.     In June 2020, Enforcement began investigating allegations that Ketchup Caddy registered demand response customers without those customers' agreement and collected the capacity payments from MISO, without making payments to the registered customers.  During its investigation, Enforcement took sworn testimony and obtained documentary evidence.

43.     On October 6, 2022, Enforcement provided Defendants with a presentation setting forth Enforcement's initial views of the evidence collected. Defendants did not provide a response to this presentation, although they were given an opportunity to do so.  On July 17, 2023, Enforcement provided notice to Defendants under section 1b.19 of the Commission's regulations of its intent to recommend the initiation of a public proceeding against Defendants (the "1b.19 Letter").  Defendants did not provide a response to the 1b.19 Letter even though they had the opportunity to do so.  *See* 18 C.F.R § 1b.19 ("Within 30 days [] the entity may submit [] a non-public response, which may consist of a statement of fact, argument, and/or memorandum of law, with such supporting documentation as the entity chooses . . . .").

44.     Pursuant to Commission procedures, Enforcement provided a Staff Report to the Commission detailing the evidence gathered during Enforcement's investigation and laid out the legal theory underlying Enforcement's allegations

that Defendants violated FPA Section 222(a), 16 U.S.C. § 824v(a); the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2; and sections 69A.3.5 and 69A.7.1 of the MISO Tariff.  The Staff Report recommended that the Commission issue an Order to Show Cause against Defendants and, ultimately, that the Commission penalize Defendants for their violations.

> F.    **Commission Proceedings**

45.    On February 21, 2024, the Commission issued an Order to Show Cause directing Defendants to show cause within 30 days why they should not be found to have violated FPA Section 222, 16 U.S.C. § 824v; the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2; and sections 69A.3.5 and 69A.7.1 of the MISO Tariff.  **Exhibit 1**, Order to Show Cause at P 1, Ordering Paragraph (A).  The Commission additionally directed Ketchup Caddy and Mango to show cause why they should not be assessed civil penalties of $25,000,000 and $1,500,000, respectively, and why Mango should not disgorge $506,502, plus interest, in unjust profits.  *Id.* at P.1, Ordering Paragraphs (B)-(C).  Attached to the Commission's public Order to Show Cause was Enforcement's Staff Report.  *See id.* at Appendix A.

46.    The FPA provides two pathways for respondents to contest an order to show cause.  The default path is an administrative hearing before an administrative law judge to determine on the record whether a violation occurred, and then if so,

20

the Commission assesses a penalty. *See* FPA Section 31(d)(2)(A), 16 U.S.C. §

823b(d)(2)(A). Alternatively, a respondent may elect for a prompt penalty

assessment by the Commission followed by *de novo* review in federal district

court. *See* FPA Section 31(d)(3)(A)-(B), 16 U.S.C. § 823b(d)(3)(A)-(B).

47.    Before issuing an order assessing a civil penalty, under Section

31(d)(1) of the FPA, the Commission is required to provide notice of the proposed

penalty and inform the respondent(s) of their opportunity to elect in writing within

30 days after the date of receipt of such notice the option "to have the procedures

of paragraph (3) (in lieu of those of paragraph (2)) apply with respect to such

assessment." *See* FPA Section 31(d)(1), 16 U.S.C. § 823b(d)(1).

48.    Consistent with these statutory requirements, the Order to Show

Cause provided notice to Ketchup Caddy and Mango that, "[p]ursuant to Section

31(d)(1) of the FPA, within 30 days of the date of this order, [Defendants] may []

make an election to have the procedures set forth in Section 31(d)(3) [*i.e.,* the

district court path] of the FPA apply to this proceeding." The Order to Show

Cause further provided notice that, "[s]hould [Defendants] fail to make a timely

election under Section 31(d)(1), the procedures of Section 31(d)(2) [*i.e.,* default

path] will apply." **Exhibit 1**, Order to Show Cause at Ordering Paragraph (E).

49.    On July 26, 2024, the Commission issued an order amending the

answer deadline in the Order to Show Cause to give Defendants 30 days to answer

after the Commission's Office of the Secretary served the Order to Show Cause on

Defendants.

50.    The Order to Show Cause was served on Defendants on July 26, 2024.

Defendants had until August 26, 2024, to respond.

51.    Defendants did not respond to the Order to Show Cause.  Defendants

also did not elect the procedures of FPA Section 31(d)(3) (*i.e.,* the district court

path), meaning the default penalty assessment and review provisions under FPA

Section 31(d)(2) applied.

52.    On December 5, 2024, the Commission issued the Order Assessing

Penalties against Defendants.  *See* **Exhibit 2**.

53.    In the Order Assessing Penalties, the Commission found that

Defendants violated FPA Section 222(a), 16 U.S.C. § 824v(a) and the

Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2 (2024), by engaging in a

fraudulent scheme.  **Exhibit 2**, Order Assessing Penalties at PP 1, 42-47, 51-53.

The Commission also found that Ketchup Caddy violated sections 69A.3.5 and

69A.7.1 of the MISO Tariff.  *Id.* at 1, 62-63.

54.    The Order Assessing Penalties directed Ketchup Caddy to pay a civil

penalty of $25,000,000; directed Mango to pay a civil penalty of $1,500,000; and,

directed Mango to disgorge $506,502, in unjust profits, plus applicable interest,

pursuant to section 309 of the FPA; 16 U.S.C. §825h.  **Exhibit 2**, Order Assessing

Penalties at PP 1, 88, 90, Ordering Paragraphs (A)-(C).

55.    To date, Defendants have failed to pay the penalties and disgorgement

directed by the Order Assessing Penalties.

56.    The Order Assessing Penalties noted that Mango and Ketchup Caddy

could request a rehearing no later than 30 days after the issuance of the order

assessing the penalty.  *See* **Exhibit 2**, Order Assessing Penalties at P 91.

Defendants did not request a rehearing.

57.    The Order Assessing Penalties also noted that the procedures of FPA

Section 31(d)(2) would apply, **Exhibit 2**, Order Assessing Penalties at P 91,

whereby Mango and Ketchup Caddy could "within 60 calendar days after the date

of the order of the Commission assessing such penalty, institute an action in the

United States court of appeals for the appropriate judicial circuit for judicial review

of such order[.]"[12]  Defendants did not seek judicial review of the Commission's

Order Assessing Penalties within the 60-day period provided for in Section

31(d)(2)(B) of the FPA, 16 U.S.C. § 823b(d)(2)(B), which 60-day period ended on

February 3, 2025.

---

[12] 16 U.S.C. § 823b(d)(2).

58.     Accordingly, the FPA directs that the Commission "shall institute an action to recover the amount of such penalty in any appropriate district court of the United States" and that "[i]n such action, ***the validity and appropriateness of such final assessment order or judgment shall not be subject to review***."  FPA Section 31(d)(5); 16 U.S.C.A. § 823b(d)(5) (emphasis added).

## REMEDIES AND SANCTIONS

59.     The Commission's Order Assessing Penalties directed Ketchup Caddy to pay a civil penalty of $25,000,000 and Mango to pay a civil penalty of $1,500,000.  The Commission's Order Assessing Penalties further ordered that, if Ketchup Caddy and Mango failed to make the civil penalty payments within 60 days of the issuance of the Commission's order, interest payable to the United States Treasury will begin to accrue pursuant to the Commission's regulations at 18 C.F.R. § 35.19a from the date that payment is due.  **Exhibit 2**, Order Assessing Penalties at Ordering Paragraphs (A)-(B).

60.     The Commission found these penalties to be statutorily authorized under the FPA and appropriate based on the penalty factors set forth in FPA Section 316A(b), 16 U.S.C. § 825o-1(b).  *See* **Exhibit 2**, Order Assessing Penalties at PP 1, 66-90.  Additionally, in determining the appropriate penalty amount, the Commission considered its own penalty guidelines, which are a set of rules, issued by the Commission in a non-binding policy statement, that guides the

24

Commission's discretion in imposing a civil penalty. *See id.* at PP 66-90; *see also Revised Policy Statement on Penalty Guidelines*, 132 FERC ¶ 61,216 (2010).

61.    In determining the appropriate penalties, the Commission considered a range of aggravating and mitigating factors, including that Defendants' violations caused $17,639,142.07 in market harm due to market distortion; that Defendants engaged in fraud by registering demand response resources with MISO without those resources' knowledge or consent and offering uncontracted resources into the annual PRA; and that this conduct was willful. *See* **Exhibit 2**, Order Assessing Penalties at PP 66-90.

62.    The Commission also ordered Mango to disgorge $506,502 in unjust profits from the scheme, plus applicable interest.[13]  *Id.* at PP 1, 88-90.

63.    Despite being provided repeated opportunities to do so during the Commission's administrative processes, Defendants never contested Enforcement's findings.  For instance, as explained above, Mango admitted that he participated in a fraudulent scheme. *See* **Exhibit 1**, Order to Show Cause at Appendix A, 11.  Defendants offered no response to the Commission's Order to

---

[13] As stated in the Order Assessing Penalties, the Commission's authority to order disgorgement and interest stems from section 309 of the FPA,16 U.S.C. §825h.  *Id.* at PP 1, 88, 90.  It also explains that interest shall be calculated in accordance with 18 C.F.R. § 35.19a from the date that Mango received payment of the unjust profits.  *Id.* at P. 90.

Show Cause, which specifically directed Defendants to answer within 30 days. *Id.* at PP 1, Ordering Paragraphs (A)-(C). Defendants also failed to respond to the Commission's Order Assessing Penalties, which notified Defendants of the opportunity to seek rehearing no later than 30 days after the issuance of the Order Assessing Penalties. **Exhibit 2**, Order Assessing Penalties at P 91 (*citing Process for Assessing Civil Penalties,* 117 FERC ¶ 61,317, at P 5 (2006)). Further, under the FPA, the Defendants had 60 days to appeal the Order Assessing Penalties in a Court of Appeals where the court would have had "jurisdiction to enter a judgment affirming, modifying, or setting aside in whole or in Part" the Commission's Order Assessing Penalties. FPA Section 31(d)(2)(B); 16 U.S.C. § 823b(d)(2)(B). *See also* **Exhibit 2**, Order Assessing Penalties at P 91 (noting that the procedures of Section 31(d)(2) of the FPA apply).

64.   Defendants did not seek appeal.

65.   Defendants have not paid the penalties or disgorgement ordered by the Commission.

66.   Under these circumstances, the FPA provides that the "validity and appropriateness" of the Commission's Order Assessing Penalties is no longer subject to review. FPA Section 31(d)(5); 16 U.S.C § 823b(d)(5). All that remains, and the relief the Commission seeks herein, is an order from this Court to aid in the

enforcement of the Commission's Order Assessing Penalties and the recovery of the monies sought therein.

### CLAIM FOR RELIEF

67.     The Commission restates and incorporates by reference paragraphs 1-66 above as if set forth fully herein.

68.     The Commission found that Defendants used or employed a fraudulent device, scheme, or artifice, or engaged in an act, practice, or course of business that operated as a fraud or deceit, with scienter, in connection with the purchase or sale of electric energy subject to the jurisdiction of the Commission in contravention of FPA Section 222, 16 U.S.C. § 824v, and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2.

69.     Further, the Commission found that Defendants violated sections 69A.3.5 and 69A.7.1(a) of the MISO Tariff, a Commission-approved tariff.

70.     As set forth above, Defendants did not seek appeal or pay the penalties or disgorgement ordered by the Commission within the time permitted by statute and the Order Assessing Penalties.

71.     Accordingly, the Commission is entitled to an order from this Court enforcing its assessment of civil penalties against Defendants under FPA Section 31(d)(5), 16 U.S.C. § 823b(d)(5), and ordering Defendant Mango to disgorge his unjust profits, plus interest.

## **REQUESTED RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court:

(A)    Enter an order and judgment affirming the Commission's assessment of a $25,000,000 civil penalty against Defendant Ketchup Caddy, plus applicable interest;

(B)    Enter an order and judgment affirming the Commission's assessment of a $1,500,000 civil penalty against Defendant Mango, plus applicable interest;

(C)    Enter an order requiring Defendant Mango to disgorge $506,502 in unjust profits, plus applicable interest; and

(D)    Order such other and further relief as the Court may deem necessary and appropriate.

[Signatures on following page.]

DATED:  May 6, 2025                FEDERAL ENERGY REGULATORY
                                   COMMISSION

                                   Respectfully submitted,

                                   GEOF HOBDAY, JR.
                                   Director,
                                   Division of Investigations

                                   JOHN R MATSON, III
                                   Deputy Director,
                                   Division of Investigations


                                   By:    _____/s/_____


                                        Christine Carey (Lead)
                                        Margaret Smilowitz
                                        Gabriel Sterling III
                                        Nicholas Stavlas
                                        Attorneys
                                        Division of Investigations
                                        Office of Enforcement
                                        Federal Energy Regulatory
                                        Commission
                                        888 1st Street, N.E.
                                        Washington, D.C. 20426
                                        christine.carey@ferc.gov
                                        margaret.smilowitz@ferc.gov
                                        gabriel.sterling@ferc.gov
                                        nicholas.stavlas@ferc.gov
                                        (202) 502-8555

                                        *Attorneys for Plaintiff*